

# NUMBER 13-21-00063-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN THE MATTER OF THE MARRIAGE OF
## GERMAN NEFTALI CONTRERAS AND VITA GISELA CONTRERAS
## AND IN THE INTEREST OF D.C., J.C., AND D.C., CHILDREN

### On appeal from the 206th District Court
### of Hidalgo County, Texas.

# MEMORANDUM OPINION

### Before Justices Longoria, Hinojosa, and Silva
### Memorandum Opinion by Justice Longoria

Appellant German Neftali Contreras appeals from a final divorce decree dissolving his marriage to Vita Gisela Contreras. By three issues, which we reorganize and re-number, German challenges the trial court's imposition and assessment of (1) child support, (2) support for an adult disabled child, and (3) spousal maintenance. *See* TEX. FAM. CODE ANN. §§ 154.001, .302(a). We affirm in part and reverse and remand in part.

# I. BACKGROUND

## A. Trial Testimony

German and Vita were married in February 1998 and separated in October 2019. During their marriage, the parties had three children: Damaris, an adult child born in 1998, and J.C.[1] and D.C., minor children born in 2002 and 2005, respectively.

At a September 15, 2020 hearing, the parties stipulated that they would be joint managing conservators of the minor children; that Vita would retain the right to designate the primary residence of the minor children without regard to geographic restriction; that German would be awarded standard visitation of the minor children; and that German would be ordered to pay child support and medical support for the minor children in an amount that had not yet been determined.

German testified that he had been married to Vita for twenty-two years, and that when they married, he told her "[Y]ou take care of the kids, and I [wi]ll take care of the payments." Vita was a housewife until she became employed as a provider for Damaris when Damaris turned eighteen. German testified that Damaris "[is] in a wheelchair," "can[not] walk, and she can[not] move her hands," and has had this condition[2] "[s]ince she was born."[3] German testified that Damaris can get a job but would have to have

---

[1] To protect the identity of the minor children, we refer to the children and their relatives by their initials or an alias. *See* TEX. FAM. CODE ANN. § 109.002(d); TEX. R. APP. P. 9.8(a).

[2] German also testified that the name of Damaris's diagnosis or condition was called Larsen, but he admitted he was not certain. *See generally* MedlinePlus, *Larsen Syndrome*, U.S. Nat'l Libr. of Med., https://medlineplus.gov/genetics/condition/larsen-syndrome (last visited Dec. 1, 2022) (defining "Larsen syndrome" as a "disorder that affects the development of bones throughout the body").

[3] On cross-examination, German testified that Damaris was born with her physical handicap.

"supervision, like somebody taking her to work and stuff" if she were to live on her own. Damaris receives "about $700 per month from Social Security benefits," and attends the University of Texas Rio Grande Valley (UTRGV) through financial aid and was on track to graduate with a fine arts degree in 2021. German noted that Vita transports Damaris to UTRGV in a van that was purchased specifically to transport Damaris, which has a ramp. German admitted that he has never paid for Damaris's tuition and has provided no money to her other than a one-time cost for repairing her wheelchair.

German further testified that he currently works doing construction for his sister-in-law at her business, Kingdom Homes, since returning to Hidalgo County in November 2019. Prior to his return, German had lived and worked in Louisiana since 2017. German testified that he earned more income in Louisiana, "not every month, but sometimes it would be around [$]5,000, or [$]4,000." The following colloquy occurred between German and his counsel regarding German's relocation to Hidalgo County:

| [Counsel:] | And again, explain to the Court why it is that you would come to Hidalgo County and earn less money? |
|---|---|
| [German:] | Because I wanted to spend time with my family, my kids, my—my mother. |
| [Counsel:] | And did this happen only after you knew of Vita's desire to get divorced? |
| [German:] | Yes. I told her . . . . I told her that I was done with Louisiana and that was it. |
| [Counsel:] | And this average that you gave and what you were earning in Louisiana, four to five thousand dollars a month, would that be the average for the entire time you were working up in Louisiana? |

[German:]                          Yes.

According to German, as of 2020 he earns an average of $2,300 per month. In addition, German testified that his 2019 tax return indicated he earned approximately $14,700 for 2019, and that he had declared all the income he had earned in his 2019 tax return.

Regarding his expenses, German testified that he pays $830 per month for a new truck. He also pays for his phone bill, and "just small bills, like, as far as credit cards, but it[ is] not much." German had been living at his mother's house but moved "because of . . . COVID" and was currently living at his sister's house. German admitted that he does not pay rent nor spend money on food because his mother cooks. German also testified that he currently provides Vita $900 a month, which she uses to pay the mortgage for the house she and the children live in. German originally provided $1,500 per month to Vita when they separated in October 2019 through January 1, 2020. He stated, "At first I was giving her [$]1[,]500, and then I came down to [$]1[,]200, and now I[ a]m paying [$]900 a month."

Vita testified that Damaris was her first-born child, has arthrogryposis[4], and cannot walk or lift her hands. Vita has been Damaris's caregiver since Damaris was born and provides her 24-hour assistance at home. Vita stated, "As soon as [Damaris] wakes up, I lift her from . . . the bed to the chair, transfer her. Then [Damaris] goes to the restroom. Transfer [sic] from the chair to the toilet. Then . . . shower her." Vita also drives Damaris

---

[4] *See generally* MedlinePlus, *Distal Arthrogryposis type 1*, U.S. Nat'l Libr. of Med., https://medlineplus.gov/genetics/condition/distal-arthrogryposis-type-1 (last visited Dec. 1, 2022) (defining "Distal Arthrogryposis type 1" as a "disorder characterized by joint deformities (contractures) that restrict movement in the hands and feet").

to UTRGV and assists her in attending her college courses by, among other things, setting up Damaris's materials for the classroom and helping her use the restroom. According to Vita, Damaris's van is paid for by Damaris's supplemental security income (SSI). Damaris receives $704.70 every month in SSI, and $511.69 is used from that money to pay for the van. Damaris uses the rest of the money for gas and food. In addition, Damaris utilizes money from her college financial aid to purchase school supplies and books.

Vita further testified that she has worked as Damaris's provider since Damaris turned 18, is paid about $1,080 per month, and works eighteen hours per week. According to Vita, being Damaris's provider prevents her from finding other employment. Vita stated

> I can find a job, but who[ i]s going to take care of Damaris? Who[ i]s going to pay them to take care of her? Like, if I make, like, $1,000, I[ a]m going to spend it on somebody else to care for her . . . . Yeah. Who[ i]s going to take her to school? Who[ i]s going to drive her to school? Who[ i]s going to shower her, you know?

Vita graduated high school and attended one year of college but has received no training for any profession or job. In terms of monthly expenses, Vita pays for her own car, insurance for her vehicle and Damaris's van ($160), water ($60), electricity ($250 in summer months, then $150), and cellphones for herself and her children. Vita receives $340 per month in food stamps that she uses to pay for groceries. Vita also pays the mortgage, which costs $918 per month—she uses the $900 she receives from German to pay it and pays the remaining $18 herself. Vita was seeking $1,000 in spousal support to pay her "bills and the stuff that [she] need[s], like . . . the mainly basics, like toilet paper, everything." Vita was seeking $500 per month in support for Damaris "just to replace the [$]500 that [Damaris] pay[s] on her van" so that Damaris "can have her SSI back." Vita

5

testified, "I want to keep the house for Damaris. It[ is]—Damaris is going to be a lifetime. She[ is] going to stay with me. Like, . . . she will never be independent . . . . [Damaris] will need to pay somebody to take care of her, maybe half [a] day."

Regarding German's current employment, Vita expressed that she believed German came back to work in Hidalgo County from Louisiana "[b]ecause he does[ not] want to make money to pay child support," "he does[ not] care," "he never talk[s] to the kids," and "he does[ not] care about them." Vita testified that since returning to Hidalgo County in September 2019, German had only visited Damaris and J.C. twice, and he has not spoken to D.C. since May 2020. According to Vita, she had access to German's Chase bank account and stated that German was generating $8,000 in monthly income in 2018. Vita further testified that German deposited $10,000 a month in the Chase bank account in 2019. In addition, Vita testified that German is currently self-employed, paid in cash, and does not use his Chase account. Vita opined that German was earning more money than when he worked in Louisiana and did not believe that he was making less. Although she admitted to not having proof of her assertion, she expressed, "He[ i]s a hard working man. I know that for sure. He wants—he loves money. I know that."

Damaris testified that Vita has cared for her substantially since she turned eighteen to the present. Damaris stated that Vita takes her to school and assists her in the classroom and with homework. According to Damaris, Vita helps her use the restroom, take a shower, change clothes, style her hair, and get ready—among other things. Damaris prefers Vita as her provider because she is not comfortable with other people helping her. Damaris testified, "[A] lot of the time [other providers] do[ not] really know

how, and even if you tell them, they w[ill ]n[o]t do it correctly." Damaris testified that the SSI she receives is not enough to pay for all her needs and expenses and she is left with $100–200 after making payments on the van. Damaris does not receive any food stamps or any other aid from organizations. Vita helps Damaris financially and provides her $100 per month to pay other expenses that Damaris cannot. Damaris tried finding work through the Texas Workforce Commission but had no luck finding anything "that works" and acknowledged that "a lot of jobs require you to do physical stuff" and she "can[not] really do any physical labor."

Damaris acknowledged that German had not spent a lot a time with her or her siblings since returning to Hidalgo County from Louisiana, and she was spending even less time with German since COVID.

## B.    Final Divorce Decree

The final decree of divorce, rendered on December 12, 2020, ordered German to pay $900 per month in child support until one of the minor children becomes ineligible, and $720 per month thereafter until the other minor child becomes ineligible. The decree further stated that

> Damaris Contreras, an adult child of this marriage, requires substantial care and personal supervision because of a mental or physical disability and will not be capable of self-support, that the disability existed or its cause was known to exist before or on the child's eighteenth birthday, that payments for the support of this child should be continued for an indefinite period, and that both parents have a duty to support the child.

See id. § 154.302. Accordingly, the decree ordered German to pay $500 per month to Damaris "until the first month following the death of [Damaris] or further order modifying this child support." The decree further stated that "Vita . . . is eligible for maintenance

7

under the provisions of Texas Family Code chapter 8." Accordingly, the decree ordered German to pay as maintenance $1,000 per month to Vita for thirty-six months, or "until . . . the earliest of one of the following events occurs: 1. death of either [German] or [Vita]; 2. remarriage of Vita . . .; or 3. further orders of the Court affecting the spousal maintenance obligation, including a finding of cohabitation by Vita . . . ."

German filed a motion for new trial, which was denied by the trial court. This appeal followed.

## II.  STANDARD OF REVIEW

"A court's order of child support will not be disturbed on appeal unless the complaining party can show a clear abuse of discretion." *Iliff v. Iliff*, 339 S.W.3d 74, 78 (Tex. 2011) (quoting *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (per curiam)); *see also Rodriguez v. Rodriguez*, 860 S.W.2d 414, 415 (Tex. 1993). In addition, we also review a trial court's decision to award spousal maintenance for an abuse of discretion. *Sherman v. Sherman*, 650 S.W.3d 897, 899 (Tex. App.—Fort Worth 2022, no pet.).

"A trial court abuses its discretion when it acts arbitrarily or unreasonably, without reference to guiding rules or principles." *Iliff*, 339 S.W.3d at 78 (citing *Worford*, 801 S.W.2d at 109, and then citing *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985)). "Under this standard, legal and factual sufficiency of the evidence are not independent grounds for asserting error but are relevant factors in determining whether the trial court abused its discretion." *Coburn v. Moreland*, 433 S.W.3d 809, 823 (Tex. App.—Austin 2014, no pet.). "In determining whether the trial court abused its discretion, we consider whether the trial court had sufficient evidence upon which to exercise its

8

discretion and, if so, whether it erred in the exercise of that discretion." *Id.* (citing *In re W.C.B.*, 337 S.W.3d 510, 513 (Tex. App.—Dallas 2011, no pet.)).

When conducting a legal sufficiency review, we credit favorable evidence if a reasonable factfinder could do so and disregard contrary evidence unless a reasonable factfinder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *Brown v. Brown*, 236 S.W.3d 343, 348 (Tex. App.—Houston [1st Dist.] 2007, no pet.). We consider the evidence in the light most favorable to the finding under review, and we indulge every reasonable inference that would support the finding. *City of Keller*, 168 S.W.3d at 822. In reviewing for factual sufficiency, we consider all the evidence supporting and contradicting the finding. *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). Findings may be overturned only if they are so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *In re L.A.F.*, 270 S.W.3d 735, 739 (Tex. App.—Dallas, 2008 pet. denied) (citing *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam)). In this case, the trial court made no findings of fact, and the parties requested none. *See* TEX. R. CIV. P. 296, 297.[5] Therefore, "we assume the trial court made all necessary findings to support its judgment and will affirm if the judgment can be upheld on any legal theory that is supported by the evidence." *In re A.A.T.*, 583 S.W.3d 914, 921 (Tex. App.—El Paso, 2019, no pet.). "[T]he trial judge is best able to observe and assess the witnesses' demeanor and credibility, and to sense the 'forces, powers, and influences' that may not be apparent from merely reading the record on appeal." *In re A.L.E.*, 279 S.W.3d 424, 427 (Tex. App.—Houston [14th Dist.] 2009, no

---

[5] We note that the Texas Family Code requires the trial court to make specific findings in child support orders in certain circumstances not applicable to this case. TEX. FAM. CODE ANN. § 154.130.

pet.). We, therefore, defer to the trial court's judgment in matters involving factual resolutions and any credibility determinations that may have affected those resolutions. *George v. Jeppeson*, 238 S.W.3d 463, 468 (Tex. App.—Houston [1st Dist.] 2007, no pet.); *see also In re Marriage of Grossnickle*, 115 S.W.3d 238, 248 (Tex. App.—Texarkana, 2003 no pet.) ("The trial court, as sole judge of the credibility of witnesses, may choose whether to believe a particular witness.") (cleaned up).

## III. CHILD SUPPORT

In his first issue, German argues that there is insufficient evidence supporting the trial court's assessment of child support. In connection to this issue, German claims that the trial court's order assessed child support "above the guidelines" pursuant to § 154.123 of the Texas Family Code. German also raises other sub-issues in which he argues that Vita failed to plead for child support "above the guidelines"; that this issue was not tried by consent; and that the trial court abused its discretion in ordering child support "above the guidelines" pursuant to § 154.123 and § 154.126 of the Texas Family Code. We first address German's arguments regarding sufficiency and whether the trial court assessed child support "above the guidelines" because it is dispositive.

## A. Applicable Law

A trial court has broad discretion to determine child support awards within the guidelines of the family code. *See* TEX. FAM. CODE ANN. §§ 154.121–.123; *Rumscheidt v. Rumscheidt*, 362 S.W.3d 661, 667 (Tex. App.—Houston [14th Dist.], 2011 no pet.) ("The trial court has broad discretion setting and modifying child-support payments.") (cleaned up).

For purposes of determining child support liability, the trial court shall calculate net resources, including all wage and salary income and other compensation for personal services, interest, dividends and royalty income, self-employment income, net rental income, and all other income actually being received. *See* TEX. FAM. CODE ANN. § 154.062(a), (b). "Courts may calculate net resources on imprecise information." *Ayala v. Ayala*, 387 S.W.3d 721, 727 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (cleaned up). However, "there must be some evidence of a substantive and probative character of net resources in order for the court to discharge this duty." *Id.* (quoting *Newberry v. Bohn-Newberry*, 146 S.W.3d 233, 236 (Tex. App.—Houston [14th Dist.] 2004, no pet.)).

The percentage guidelines are set at "25% of Obligor's Net Resources" for two children, and "20% of Obligor's Net Resources" for one child. TEX. FAM. CODE ANN. § 154.125(b). However, the trial court may order periodic payments in an amount other than that established by the guidelines if the evidence rebuts the presumption that application of the guidelines is in the best interest of the child and justifies a variance from the guidelines. *Id.* §§ 154.122(b) ("A court may determine that the application of the guidelines would be unjust or inappropriate under the circumstances."); 154.123(a); *see also id.* § 154.123(b) (providing list of factors trial courts shall consider in determining that child support in an amount established by the guidelines would be unjust or inappropriate).

Section 154.066 of the Texas Family Code provides that a trial court may order a parent to pay child support beyond the amount the parent's income would ordinarily indicate under the guidelines if the parent could potentially earn more money but has

11

intentionally chosen not to. TEX. FAM. CODE ANN. § 154.066; *In re N.T.*, 335 S.W.3d 660, 666 (Tex. App.—El Paso, 2011, no pet.) (cleaned up).

"While the trial court may consider whether [an] obligor [parent] is attempting to avoid child support by becoming or remaining unemployed or underemployed as a factor in its child support determination, such proof is not required for a court to be able to set child support based on earning potential." *Iliff*, 339 S.W.3d at 81. "But to support a finding of intentional underemployment, it is not enough to simply establish that the obligor is failing to maximize his potential." *Trumbull v. Trumbull*, 397 S.W.3d 317, 321 (Tex. App.—Houston [14th Dist.] 2013, no pet.). "By statute, the obligee must show that the actual earnings of the obligor are 'significantly less' than his earnings potential." *Id.* (citing TEX. FAM. CODE ANN. § 154.066; *Iliff*, 339 S.W.3d at 82 ("Trial courts should be cautious of setting child support based on earning potential in every case where an obligor makes less money than he or she has in the past.")).

In addition, a court may order additional child support depending on the income of the parties and proven needs of the children. *See* TEX. FAM. CODE § 154.126(a). However, § 154.126 only applies where the obligor's monthly net resources exceed $9,200.[6] *Id.*

## B.    Discussion

As previously mentioned, the trial court's order set German's child support at $900 per month until one of the minor children becomes ineligible, and $720 per month thereafter until the other minor child becomes ineligible. It is undisputed that German is

---

[6] Under the guidelines effective September 1, 2019, the amount of the net-resources cap appliable here is $9,200. *See* 44 Tex. Reg. 3559, 3559 (July 12, 2019) (Office of the Att'y Gen., Announcement of Adjustment Required by Texas Family Code § 154.125); *see also* TEX. FAM. CODE § 154.125.

father to two minor children. Assuming the trial court followed the guidelines, and thus did not impose a variance pursuant to § 154.123(a), the trial court could have impliedly found German's monthly net resources to be $3,600—as 25% of $3,600 is $900 and 20% of $3,600 is $720—or that he was underemployed and had the potential to earn this amount. *See* TEX. FAM. CODE ANN. §§ 154.066(a), 154.123(a), 154.125(b).

There is no evidence in the record directly disputing German's current earnings, which he testified was $2,300 per month. Though Vita opined that German was earning more money than when he worked in Louisiana and did not believe that he was making less, she nevertheless admitted to not having proof of her assertion. However, in making its child support determination, the trial court could have invoked the authority of § 154.066, which states that a child support order may be based on the earning potential of the obligor rather than his actual income, "[i]f the actual income of the obligor is significantly less than what the obligor could earn because of intentional unemployment or underemployment." *See id.* § 154.066(a). German testified that he worked in Louisiana from 2017 prior to his return to Hidalgo County in November 2019 and admitted to earning an average of $4,000 to $5,000 a month. Based on German's testimony, the trial court could have found that German previously earned $5,000 per month, which under the 2020 Tax Chart results in net resources above $3,600 for self-employed and employed persons. *See id.* § 154.061. While the record does not contain documentary evidence of bank statements and income tax returns, the trial court "may calculate net resources on 'imprecise information.'" *Ayala*, 387 S.W.3d at 727. Regarding the conflicting testimony of German and Vita, the trial court, as sole judge of the credibility of witnesses, may

13

choose whether to believe a particular witness. *See Grossnickle*, 115 S.W.3d at 248.

In addition, German testified that he returned to Hidalgo County from Louisiana only after he knew of Vita's desire to divorce. Though German testified that one of the reasons he returned to Hidalgo County was that he wanted to spend time with his children, Vita and Damaris both testified that German had not spent much time with his children upon his return. Here, the trial court could have found that German was underemployed for purposes of avoiding child support. *See Iliff*, 339 S.W.3d at 81.

Accordingly, the evidence is legally and factually sufficient to support an implied finding that German's current actual income was significantly less than what German could earn. *See City of Keller*, 168 S.W.3d at 822, 827; *Plas-Tex, Inc.*, 772 S.W.2d at 445; *In re L.A.F.*, 270 S.W.3d at 739. Having found the evidence sufficient to support the trial court's assessment of child support within the child support guidelines, we cannot say that the trial court abused its discretion. *See Coburn*, 433 S.W.3d at 823. In addition, we do not find the amount of child support ordered by the trial court constituted a variance from the guidelines pursuant to § 154.123(a), and we decline to address that sub-issue. *See* Tex. Fam. Code Ann. § 154.123(a). Moreover, we do not find that the trial court ordered additional child support under § 154.126, and we decline to address that sub-issue. *See id.* § 154.126. We overrule German's first issue.

## IV. SUPPORT FOR DISABLED CHILD

In his second issue, German argues there was insufficient evidence to support the trial court's imposition and assessment of support of an adult disabled child. In connection to this claim, German raises several sub-issues that we address separately.

14

## A.    Applicable Law

Section 154.302 of the Texas Family Code provides:

(a)    The court may order either or both parents to provide for the support of a child for an indefinite period and may determine the rights and duties of the parents if the court finds that:

   (1)    the child, whether institutionalized or not, requires substantial care and personal supervision because of a mental or physical disability and will not be capable of self-support; and

   (2)    the disability exists, or the cause of the disability is known to exist, on or before the 18th birthday of the child.

(b)    A court that orders support under this section shall designate a parent of the child or another person having physical custody or guardianship of the child under a court order to receive the support for the child. The court may designate a child who is 18 years of age or older to receive the support directly.

TEX. FAM. CODE ANN. § 154.302(a), (b). In determining the amount of support to be paid after a child's eighteenth birthday, the specific terms and conditions of that support, and the rights and duties of both parents with respect to the support of the child, the court shall determine and give special consideration to:

   (1)    any existing or future needs of the adult child directly related to the adult child's mental or physical disability and the substantial care and personal supervision directly required by or related to that disability;

   (2)    whether the parent pays for or will pay for the care or supervision of the adult child or provides or will provide substantial care or personal supervision of the adult child;

   (3)    the financial resources available to both parents for the support, care, and supervision of the adult child; and

   (4)    any other financial resources or other resources or programs available for the support, care, and supervision of the adult child.

*Id.* § 154.306.

15

**B. Discussion**

**1.    Existence of Disability Before Eighteenth Birthday**

German argues that the evidence was insufficient to demonstrate that Damaris's disability existed before her eighteenth birthday. *See id.* § 154.302(a)(2). The record contains testimony from German, Vita, and Damaris establishing that Damaris has a physical disability in which she cannot walk or use her hands and utilizes a wheelchair. German himself testified that Damaris was born with her condition and physical handicap. His testimony was corroborated by Vita's testimony wherein she stated, "[Damaris] has arthrogryposis. She can[not] walk. She can[not] lift her hands. I[ have been] her caregiver since she was born." Thus, there was legally and factually sufficient evidence demonstrating an implied finding that Damaris's disability existed, or the cause of her disability was known to exist, before her eighteenth birthday. *See id.*; *see also City of Keller*, 168 S.W.3d at 822, 827; *Plas-Tex, Inc.*, 772 S.W.2d at 445; *In re L.A.F.*, 270 S.W.3d at 739. We overrule this sub-issue.

**2.    Capability of Self-Support**

German next argues that the evidence was insufficient to demonstrate that Damaris is incapable of self-support. As previously mentioned, testimony by German, Vita, and Damaris all established that Damaris cannot walk or use her hands and utilizes a wheelchair. The evidence established that Vita provides 24-hour assistance for Damaris at home by helping Damaris use the restroom, take a shower, change clothes, style her hair, and get ready. Vita also drives Damaris to UTRGV and assists her in the classroom and with homework. Vita testified, "I want to keep the house for Damaris. It[ is]—Damaris

16

is going to be a lifetime. She[ is] going to stay with me. Like, . . . she will never be independent."

In his brief, German points out that Damaris has a "van that is custom fitted to meet her needs;" however, Damaris testified that the van was modified for her to be a passenger, not a driver. Thus, the record shows that Damaris cannot drive the van herself and relies on other persons to drive her van. German also points to testimony demonstrating that Damaris was on track to graduate with bachelor's degree in fine arts in 2021. However, Damaris has been able to accomplish this feat through the continued support of Vita. German calls attention to Damaris's testimony stating that she hopes to find employment online or through the Texas Workforce Commission. However, German testified that Damaris had never had any formal employment. In addition, Damaris testified that she tried finding work through Texas Workforce Commission but had not found anything "that works" and acknowledged that "a lot of jobs require you to do physical stuff" and she "can[not] really do any physical labor." Furthermore, the evidence established that the SSI benefits that Damaris receives is not enough to pay for all her needs and expenses, that Damaris does not receive food stamps or any other aid from organizations, and that Vita pays for expenses that Damaris cannot pay for.

Although the evidence established that Damaris is working to obtain a degree that could help her to someday seek employment, she is not currently able to support herself with a job. Thus, there was legally and factually sufficient evidence to support an implied finding that the Damaris "requires substantial care and personal supervision because of a mental or physical disability and will not be capable of self-support." *See* TEX. FAM. CODE

17

ANN. § 154.302(a)(1); *see also City of Keller*, 168 S.W.3d at 822, 827; *Plas-Tex, Inc.*, 772 S.W.2d at 445; *In re L.A.F.*, 270 S.W.3d at 739; *see also In re W.M.R.*, No. 02-11-00283-CV, 2012 WL 5356275, *5 (Tex. App.—Fort Worth, November 1, 2012, no pet.) (mem. op.) (finding sufficient evidence to support a finding that an adult disabled child requires substantial care and personal supervision despite evidence showing that the adult disabled child did not need constant supervision); *In re D.C.*, No. 13-15-00486-CV, 2016 WL 3962713, *8 (Tex. App.—Corpus Christi–Edinburg, July 21, 2016, pet. denied) (mem. op.) (finding the evidence established that an adult disabled child was not currently able to support himself with a job despite working to obtain a master's degree that would help him to someday seek employment.). We overrule this sub-issue.

### 3. Section 154.306 Factors

German next argues that "the record is void of any evidence used by the trial court as to the factors it used or considered to arrive at the amount of $500.00" and cites to § 154.306 of the Texas Family Code. We disagree. The record shows that the trial court was presented with ample evidence regarding each of the four factors enumerated in the statute. German, Vita, and Damaris testified extensively regarding Damaris's "existing [and] future needs" as well as the "substantial care and personal supervision directly required by or related to" her condition, *see id.* § 154.306(1); Vita testified about how she provides substantial 24-hour care and personal supervision to Damaris and expects to continue to be Damaris's provider in the future, *see id.* § 154.306(2); German and Vita testified regarding their financial resources, *see id.* § 154.306 (3); and Vita and Damaris testified as to other financial resources, namely Damaris's SSI benefits that are available

18

to pay for Damaris's expenses. *See id.* § 154.306(4); *see also Thompson v. Smith*, 483 S.W.3d 87, 96 (Tex. App.—Houston [1st Dist.] 2015, no pet.) (finding that "the trial court had sufficient evidence before it to consider the [§] 154.306 factors in exercising its discretion to impose the support obligation"). In particular, we note that Vita testified that she was seeking $500 in support for Damaris "just to replace the [$]500 that [Damaris] pay[s] on her van" so that Damaris "can have her SSI back." We also note Damaris's testimony that her SSI benefits are not enough to pay for all her needs and expenses, and she is left with $100–200 after making payments on the van. Thus, there was legally and factually sufficient evidence to support an implied finding that the four factors under § 154.306 justify German's support obligation for his disabled child. *See* TEX. FAM. CODE ANN. § 154.306; *see also City of Keller*, 168 S.W.3d at 822, 827; *Plas-Tex, Inc.*, 772 S.W.2d at 445; *In re L.A.F.*, 270 S.W.3d at 739. We overrule this sub-issue.

### 4. Party Responsible for Support Payment

In his last sub-issue, German argues that "the record is devoid of any finding stating which party is responsible for said payment as required by the Texas Family Code" and cites to § 154.302. The divorce decree specifically orders German to pay $500 in support directly to Damaris, and the trial court had the discretion to do so under § 154.302. *See* TEX. FAM. CODE ANN. § 154.302(a) ("The court may order either or both parents to provide for the support of a [disabled] child for an indefinite period . . . ."). Section 154.302 does not require the trial court to make any specific findings with respect to which parent is ordered to provide support for a disabled child; it only requires the trial court make the appropriate findings required by § 154.302(a)(1), (2), and in this case, the trial court did

19

so. *See id.* We overrule German's sub-issue.

Accordingly, we conclude that there is legally and factually sufficient evidence to support the trial court's imposition and assessment of support for an adult disabled child. *See City of Keller*, 168 S.W.3d at 822, 827; *Plas-Tex, Inc.*, 772 S.W.2d at 445; *In re L.A.F.*, 270 S.W.3d at 739. Having found the evidence sufficient to support the trial court's imposition and assessment of support for an adult disabled child, we cannot say that the trial court abused its discretion. *See Coburn*, 433 S.W.3d at 823. We overrule German's entire second issue.

## V.    SPOUSAL SUPPORT

In his third issue, German argues there was insufficient evidence to support the trial court's imposition and assessment of spousal maintenance. In connection to this claim, German raises several sub-issues that we address separately.

## A.    Applicable Law

Spousal maintenance is an award of "periodic payments from the future income of one spouse for the support of the other spouse." *See* TEX. FAM. CODE. ANN. § 8.001(1). The purpose of spousal maintenance is "to provide temporary and rehabilitative support for a spouse whose ability for self-support is lacking or has deteriorated over time while engaged in homemaking activities and whose capital assets are insufficient to provide support." *O'Carolan v. Hopper*, 71 S.W.3d 529, 533 (Tex. App.—Austin 2002, no pet.).

Texas Family Code § 8.051 governs a spouse's eligibility for spousal maintenance. *See* TEX. FAM. CODE ANN. § 8.051. The court may order maintenance for either spouse only if the spouse seeking maintenance will lack sufficient property, including the spouse's

separate property, on dissolution of the marriage to provide for the spouse's reasonable needs and:

> (A)    is unable to earn sufficient income to provide for the spouse's minimum reasonable needs because of an incapacitating physical or mental disability;
>
> (B)    has been married to the other spouse for 10 years or longer and lacks the ability to earn sufficient income to provide for the spouse's minimum reasonable needs; or
>
> (C)    is the custodian of a child of the marriage of any age who requires substantial care and personal supervision because of a physical or mental disability that prevents the spouse from earning sufficient income to provide for the spouse's minimum reasonable needs.

*Id.* § 8.051(2)(A)–(C). The term "minimum reasonable needs" is not statutorily defined. *Slicker v. Slicker*, 464 S.W.3d 850, 860 (Tex. App.—Dallas 2015, no pet.) (citing *Cooper v. Cooper*, 176 S.W.3d 62, 64 (Tex. App.—Houston [1st Dist.] 2004, no pet.)). Instead, determining the "minimum reasonable needs" is a fact-specific inquiry, which courts determine on a case-by-case basis. *Slicker*, 464 S.W.3d at 860 (citing *Amos v. Amos*, 79 S.W.3d 747, 749 (Tex. App.—Corpus Christi–Edinburg 2002, no pet.)).

Likewise, the term "custodian" as used in § 8.051(2)(C) is not statutorily defined. "If a statute uses a term with a particular meaning or assigns a particular meaning to a term, we are bound by the statutory usage." *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011). "Undefined terms in a statute are typically given their ordinary meaning, but if a different or more precise definition is apparent from the term's use in the context of the statute, we apply that meaning." *Id.* Because the Texas Family Code does not define "custodian," we must apply its plain meaning. "Custodian" means "[a] person or institution that has *charge* or custody (of a child, property, papers, or other

valuables); GUARDIAN." *Custodian*, BLACK'S LAW DICTIONARY (11th ed. 2019) (emphasis added). Furthermore, "charge" means "[a] person or thing entrusted to another's *care*." *Charge*, BLACK'S LAW DICTIONARY (11th ed. 2019) (emphasis added). And in the family-law context, "care" means "[t]he provision of physical or psychological comfort to another." *Care*, BLACK'S LAW DICTIONARY (11th ed. 2019).

Texas Family Code § 8.053(a) provides:

(a)    It is a rebuttable presumption that maintenance *under Section 8.051(2)(B)* is not warranted unless the spouse seeking maintenance has exercised diligence in:

(1)    earning sufficient income to provide for the spouse's minimum reasonable needs; or

(2)    developing the necessary skills to provide for the spouse's minimum reasonable needs during a period of separation and during the time the suit for dissolution of the marriage is pending.

TEX. FAM. CODE ANN. § 8.053(a) (emphasis added). "[U]nder the plain language of [§] 8.053(a), the statutory presumption only applies to maintenance sought pursuant to [§] 8.051(2)(B)." *Kelly v. Kelly*, 634 S.W.3d 335, 366 (Tex. App.—Houston [1st Dist.] 2021, no pet.) (cleaned up). "If the spouse seeks maintenance pursuant to either [§] 8.051(2)(A) or (C), the presumption in [§] 8.053(a) does not apply and the spouse is not required to present evidence that they have exercised diligence in earning sufficient income or in developing the necessary skills to provide for their minimum reasonable needs." *Id.*

After a court deems a spouse eligible to receive spousal maintenance, it then considers several factors in determining the nature, amount, duration, and manner of periodic payments. *See* TEX. FAM. CODE. ANN. § 8.052. These factors include: the financial

resources, age, employment history, earning ability, and physical and emotional condition of the spouse seeking maintenance; the time necessary to acquire sufficient education or training to enable the spouse seeking maintenance to earn sufficient income; the contribution by one spouse to the education, training, or increased earning power of the other spouse; the contribution of a spouse as homemaker; any history or pattern of family violence; and the comparative financial resources of the spouses. *See id.*

A court may not order maintenance that requires an obligor to pay monthly more than the lesser of $5,000 or 20 percent of the spouse's average monthly gross income. *Id.* § 8.055(a). Gross income includes "wage and salary income and other compensation for personal services," "self-employment income," and other specified types of "income." *Id.* § 8.055(a–1). The statute also identifies certain items not included in gross income, such as "return of principal or capital," "accounts receivable," and benefits provided by certain government programs. *Id.*

## B.    Discussion

### 1.    Eligibility Under § 8.051(2)(C)

Under the divorce decree, the trial court found that Vita was eligible to receive spousal maintenance. The divorce decree did not specify which subsection of § 8.051 that the trial court based its determination. *See id.* § 8.051. However, neither § 8.051(1) nor § 8.051(2)(A) are implicated by the facts of this case. We conclude that the trial court could have impliedly found that Vita was eligible for spousal maintenance under § 8.051(2)(C). *See In re A.A.T.*, 583 S.W.3d at 921.

The divorce decree ordered German to provide support for his disabled child. As

23

previously mentioned in our discussion of German's second issue, there is legally and factually sufficient evidence to establish that Damaris requires substantial care and personal supervision due to her physical disability. *See id.* § 8.051(2)(C). In addition, the evidence established that Damaris lives with Vita, that Vita is Damaris's primary caregiver, and that Vita is employed as Damaris's provider. Accordingly, the record is sufficient to establish that Vita is the custodian of Damaris. *See id.* Therefore, the trial court could have impliedly found that Vita was eligible for spousal maintenance under § 8.051(2)(C). *See id.*; *In re A.A.T.*, 583 S.W.3d at 921. Consequently, the presumption in § 8.053(a) does not apply; thus, Vita was not required to present evidence that she exercised diligence in earning sufficient income or in developing the necessary skills to provide for her minimum reasonable needs. *See Kelly*, 634 S.W.3d at 366 ("Under the plain language of [§] 8.053(a), the statutory presumption only applies to maintenance sought pursuant to [§] 8.051(2)(B)."); *see also* TEX. FAM. CODE ANN. § 8.053(a). Therefore, we decline to address German's argument that Vita failed to overcome the rebuttable presumption in § 8.053(a).

### 2. Minimum Reasonable Needs

German argues that Vita has sufficient property such that she is "more than able to provide for her minimum reasonable needs." German points to various parts of Vita's testimony to support his assertion and argues that the evidence was insufficient to support the trial court's award of spousal maintenance. The record established that Vita's monthly expenses included $160 for insurance for her vehicle and Damaris's van, $60 for water, $150–250 for electricity, $400 for groceries, and $918 for her home's mortgage. Vita also

24

pays for cellphones for herself and her children; however, Vita only testified as to the cost of Damaris's cell phone, which Vita pays $200 per month. Vita also pays for her own vehicle but did not testify as the amount she pays per month. Based on the record, the trial court could have impliedly found that Vita's monthly minimum reasonable needs constituted $1,888–$1,988 per month.

In terms of property, the record established that Vita earns $1,080 per month and receives $340 in food stamps per month. In his brief, German points out that he provides Vita $900 per month and appears to characterize this sum of money as Vita's property for purposes of § 8.051. Indeed, Vita testified that she uses this money to pay the $918 mortgage and pays the remaining $18 herself. However, nothing in the record indicates that German was required to pay this sum of money by the trial court; thus, German voluntarily provided this money to Vita.[7] Likewise, nothing in the record indicates that German would voluntarily continue to provide this sum to Vita indefinitely and to hold otherwise would be merely speculative at best. For these reasons, the $900 provided by German to Vita to pay the mortgage does not fall within the undefined term of "property" attributable to Vita. *See* TEX. FAM. CODE ANN. § 8.051.

German also points out testimony demonstrating that Vita manages Damaris's SSI check and appears to characterize this sum of money as Vita's property without explanation. Vita's management of Damaris's SSI benefits do not transform Damaris's

---

[7] In her brief, Vita characterizes this money as "child support." While German himself characterized the money he provided to Vita as "child support" in his testimony, we note that there are no orders rendered by the trial court in the Clerk's Record that ordered German to pay any amount of child support prior to the final divorce decree. German does not argue on appeal that this money is "child support." We also note that the evidence established that German provided this sum of money starting in October 2019, the same month that German filed his petition for divorce.

property into Vita's property. In addition, the record demonstrated that $511.69 of Damaris's $704.70 in monthly SSI benefits was used to pay for Damaris's van, while the remainder is used by Damaris for gas and food. Thus, nothing indicates that Damaris's SSI benefits were used to provide for any of Vita's minimum reasonable needs. Accordingly, the trial court could have found that Vita's property consisted of $1,420 per month (i.e., the sum of Vita's monthly earnings and food stamps), which is $468–568 short of providing for Vita's monthly minimum reasonable needs of $1,888–$1,988 per month.

German also notes that the trial court awarded Vita a three-fourth's equity interest in the parties' residence and ordered Vita to refinance or sell the home in order to pay German's one-fourth equity interest within nine months, starting October 1, 2020.[8] However, the trial court heard evidence establishing that Vita was the primary caregiver for Damaris, who required substantial care and personal supervision due to her physical disability. The trial court also heard evidence that Vita was unable to find other employment while employed as Damaris's provider. The trial court had legally and factually sufficient evidence to make a determination that Vita lacked sufficient property to provide for her minimum needs, even in the face of being awarded the residence. *See City of Keller*, 168 S.W.3d at 822, 827; *Plas-Tex, Inc.*, 772 S.W.2d at 445; *In re L.A.F.*, 270 S.W.3d at 739; *Ayala*, 387 S.W.3d at 730 (finding some sufficient evidence of wife's lack of property to provide for her minimum reasonable needs to support the trial court's award of spousal maintenance in favor of wife, even though wife was awarded marital

___

[8] We note that the divorce decree includes a finding that the equity of the community property homestead was $102,100.

26

home).

### 3.     Amount of Maintenance Award

German further argues that the evidence is insufficient to support the amount of spousal maintenance ordered and claims that the amount is excessive. The Texas Family Code specifies the monetary limits and the acceptable origin of payments required by an order for spousal maintenance. *See* TEX. FAM. CODE ANN. § 8.055. Therefore, to justify the trial court's monthly spousal maintenance award of $1,000, there had to be some evidence in the record that German's post-divorce average monthly gross income was $5,000—as 20% of $5,000 is $1,000. *See id.* § 8.055(a); *see also id.* § 8.001(1) (defining "maintenance" as "an award in a suit for dissolution of a marriage of periodic payments from the *future* income of one spouse for the support of the other spouse") (emphasis added).

The record contains insufficient evidence that German's current or future average monthly gross income met or exceeded $5,000. German testified that he currently earned $2,300 per month upon his return to Hidalgo County. Vita stated that German was earning more money than when he worked in Louisiana and did not believe that he was making less after returning to Hidalgo County. However, Vita admitted to not having proof of her assertion. Thus, Vita's statement is conclusory, and, standing alone, insufficient to support the trial court's award.

Vita argues that the trial court can use the earning potential of an obligor spouse who is intentionally underemployed when calculating the amount of spousal maintenance. In our earlier discussion of German's first issue, we held that the evidence was sufficient

27

for the trial court to impliedly find that German was intentionally underemployed and that the trial court did not abuse its discretion in impliedly basing German's child support obligation on his earning potential rather than his actual income. *See id.* § 154.066(a). However, § 8.055 includes no equivalent provision authorizing the trial court to assess spousal maintenance based on earning potential rather than actual income due to intentional underemployment. Vita cites to *Mathis v. Mathis*, No. 12-17-00049-CV, 2018 WL 1324777 (Tex. App.—Tyler Mar. 15, 2018, no pet.) (mem. op.) and *Marquez v. Marquez*, No. 04-04-00771-CV, 2006 WL 1152235 (Tex. App.—San Antonio May 3, 2006, no pet.) (mem. op.) as support for her argument, but these unpublished cases are neither factually analogous nor stand for the proposition that courts are authorized by § 8.055 to base an award of spousal maintenance on earning potential rather than actual income due to intentional underemployment, and we have found none.

Because there is insufficient evidence demonstrating that German's average monthly gross income was $5,000 or more, we hold the trial court abused its discretion in ordering a spousal maintenance award of $1,000. *See* TEX. FAM. CODE ANN. § 8.055; *Sherman*, 650 S.W.3d at 899. Because the amount of maintenance awarded by the trial court is discretionary only within the statutory limits, we will reverse the judgment of the trial court relating to the amount of spousal support awarded and remand for a new trial on the amount of spousal maintenance to be awarded to Vita. *Deltuva v. Deltuva,* 113 S.W.3d 882, 888–889 (Tex. App.—Dallas 2003, no pet.) (reversing a portion of a final decree of divorce providing for four years of spousal maintenance and remanding the case for further proceedings on the issue of the duration of spousal maintenance); *Evans*

*v. Evans*, No. 02-19-00132-CV, 2020 WL 1808294, *5 (Tex. App.—Fort Worth, April 9, 2020, no pet.) (mem. op.) (holding there was insufficient evidence to support the amount of spousal maintenance awarded by the trial court, reversing the judgment of the trial court relating to the amount of spousal support awarded and remanding for a new trial on the amount of spousal maintenance to be awarded); *Schindler v. Schindler*, No. 13-16-00483-CV, 2018 WL 3151857, *8 (Tex. App.—Corpus Christi–Edinburg, June 28, 2018, no pet.) (mem. op.) (same). We sustain this sub-issue.

## VI. CONCLUSION

We affirm the divorce decree's awards of child support and support for a disabled child. We reverse the portion of the divorce decree related to the amount of spousal maintenance, and we remand for a new trial solely on that issue. *See* TEX. R. APP. P. 43.2(a), (d); *Deltuva,* 113 S.W.3d at 888–89; *Evans*, 2020 WL 1808294, at *5; *Schindler*, 2018 WL 3151857, at *8.

NORA L. LONGORIA
Justice

Delivered and filed on the
29th day of December, 2022.

29